UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re:

THOMAS E. WALSH and
DOROTHY P. WALSH,

                     Debtors.
----------------------------------------------------------------x

Case No. 20-73145-reg

Chapter 13

# MEMORANDUM DECISION

Before the Court is a motion by the Debtors to strip off a second mortgage lien on their primary residence (the "Property") and treat the remaining debt (approximately $200,000)[1] as an unsecured claim in this chapter 13 case pursuant to 11 U.S.C. §§ 506(a) and (d) and § 1322(b)(2) (the "Motion"). The Debtors may strip off the junior lien and treat the underlying debt as an unsecured claim in their chapter 13 plan if the value of the Property on the petition date is less than the amount owed on the first mortgage on the same date. *See Pond v. Farm Specialist Realty* (*In re Pond*), 252 F.3d 122, 126 (2d Cir. 2001). The balance of the first mortgage on the Property was $339,862.54 as of the petition date, and the Debtors value the Property at $330,000. Windward Bora LLC ("Junior Lienor") holds the second mortgage on the Property. The Junior Lienor opposes the motion and has presented an appraisal that values the Property at $350,000. If the Junior Lienor can demonstrate that the Property is worth one dollar more than the outstanding balance of the first mortgage, then the Debtors' Motion must be denied.

For the reasons set forth herein, the Court concludes that the Property is worth more than $339,862.54, the balance of the first mortgage, and the Motion must be denied.

---

[1]      On November 11, 2020, the Debtors filed a proof of claim on behalf of the Junior Lienor in the amount of $167,644.88. On December 16, 2020, the Junior Lienor filed an amended proof of claim (No. 5-2) on its own behalf, in the amount of $202,089.27.

1

PROCEDURAL HISTORY

The Debtors filed a petition for relief under chapter 13 of the Bankruptcy Code on October 12, 2020 ("Petition Date"). On November 11, 2020 they filed the Motion. ECF No. 15. The Junior Lienor filed opposition to the Motion on December 2, 2020. ECF No. 23. The Debtors filed a supplemental motion ("Supplemental Motion") on January 4, 2021, attaching an updated appraisal for the Property. ECF No. 28. The Junior Lienor filed supplemental opposition ("Supplemental Opposition") on February 25, 2021. ECF No. 33.

A hearing on the Motion was held on April 19, 2021 and the matter was scheduled for an evidentiary hearing on valuation. The evidentiary hearing was held on May 13, 2021 at which time the Court heard testimony from both the Debtors' and the Junior Lienor's appraisers. Both appraisers were qualified as experts and competing appraisals were submitted into evidence. At the conclusion of the hearing the matter was marked submitted.

FACTS

The Debtors own and reside at the Property located in Oakdale, New York. The Property is encumbered by a first mortgage lien which secures an outstanding debt of $339,862.54 as of the Petition Date. The Junior Lienor holds a second mortgage lien on the Property with a balance of approximately $200,000 as of the Petition Date.[2] The Debtors value the Property at $330,000, supported by an appraisal attached to the Supplemental Motion. The Debtors argue that based on the amount of outstanding senior debt relative to the appraised value of the Property as of the Petition Date the second mortgage is wholly unsecured, and the lien securing the debt may be

---

2     *See supra* note 1.

stripped pursuant to 11 U.S.C. §§ 506(a), (d) and 1322(b). Avoiding the second mortgage lien would leave the Junior Lienor with an unsecured claim to be paid through a chapter 13 plan *pari passu* with other unsecured creditors. The Junior Lienor opposes the Motion and has provided an appraisal valuing the Property at $350,000 as of the Petition Date. The Debtors are entitled to the relief requested in the Motion only if the Court finds that the Property is worth $339,862.54 or less.

LEGAL STANDARD

A chapter 13 debtor may seek to avoid a junior mortgage lien on his or her residence if that lien is determined to be wholly unsecured pursuant to Bankruptcy Code §§ 506(a), 506(d), and 1322(b). *Pond v. Farm Specialist Realty* (*In re Pond*), 252 F.3d 122, 126 (2d Cir. 2001). Section 506(a) provides that "a claim is secured only to the extent of the value of the property on which the lien is fixed." *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239, 109 S. Ct. 1026, 103 L. Ed. 2d 290 (1989)). In a chapter 13 case, the relevant provisions of the Bankruptcy Code have been interpreted to protect a junior mortgage lien if the debtor's residence retains enough value to even partially secure that creditor's claim. *Id.* Therefore, if a junior mortgage is partially secured, the lien may not be avoided. *Id.*

The initial burden of establishing the value of the real property in this context is on the debtor. *See, e.g.*, *In re Hassan*, Case No. 14-73711, 2015 WL 5895481, at *4 (Bankr. E.D.N.Y. Oct. 8, 2015) (citing *In re Lepage*, 2011 WL 1884034, at *4 (Bankr. E.D.N.Y May 18, 2011) (citing *Karakas v. Bank of New York (In re Karakas)*, No. 06-32971, 06-80245, 2007 WL 1307906 at *6 (Bankr. N.D.N.Y. May 3, 2007)). The debtor must prove that "there is not even one dollar of value" in the property to support the lien which the debtor seeks to avoid. *In re*

*Karakas*, 2007 WL 1307906, at *6. A debtor typically meets its initial burden by presenting an appraisal to support the valuation of its property. After the debtor meets its initial burden of proof, the burden shifts to the secured creditor to rebut the debtor's valuation by a preponderance of the evidence. *In re Heritage Highgate, Inc.*, 679 F.3d 132, 140 (3d Cir. 2012) (citing *In re Robertson*, 135 B.R. 350 (Bankr. E.D. Ark. 1992)). Once a party rebuts the debtor's valuation, the court considers the entire record to determine whether the debtor's valuation has been overcome. *In re Park Ave. Partners Ltd. P'ship*, 95 B.R. 605, 610 (Bankr. E.D. Wisc. 1988). A court should carefully compare the logic of the analyses and the persuasiveness of the reasoning in each appraisal. *Id.*

Valuation of assets is "not an exact science" and courts are granted "wide latitude in determining value." *In re Karakas*, 2007 WL 1307906, at *6. Courts are not bound by appraisals presented in determining the value of property, and the Court may form its own opinion after giving the appraisals and the appraisers' testimony consideration. *Wright v. Chase (In re Wright)*, 460 B.R. 581, 584 (Bankr. E.D.N.Y. 2011) (citing *In re Patterson*, 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007) (other citations omitted)). "The Court may look to the accuracy, credibility and methodology employed by the appraisers" to determine the proper valuation of property. *LePage v. Bank of America (In re LePage)*, Case No. 10-74093, Adv. Proc No. 10-8287, 2011 WL 1884034, at *4 (citing *In re YL 87th Holdings I LLC*, 423 B.R. 421, 428-35 (Bankr. N.D.N.Y.2010), and *In re Carmania Corp. N.V.*, 156 B.R. 119, 121 (Bankr. S.D.N.Y.1993)).

## DISCUSSION

The Debtors retained Scot C. Berke ("Mr. Berke"), a certified R.E. General Appraiser in the state of New York, who appraised the property at $330,000 ("Berke Appraisal"). The Junior

Lienor retained Anthony Giuffre ("Mr. Giuffre"), also a certified R.E. General Appraiser in the state of New York ("Giuffre Appraisal"). The Court accepts the testimony of both Mr. Berke and Mr. Giuffre as experts and finds that each were sufficiently qualified to render an appraisal of the Property.

Both Mr. Giuffre and Mr. Berke used the sales comparison approach to value the Property. The sales comparison approach takes properties that are sold in the general proximity of the subject property, otherwise known as comparables, and compares them with the subject property, monetarily adjusting for differences in order to determine an approximate market value for the subject property. An appraisal lists various features that a property either has or does not have, and the monetary adjustments for the subject and comparable properties are made based on a property's features.

The Berke Appraisal lists six comparables with adjusted sales prices ranging between $291,000 and $400,000. ECF. No. 28. Five of the six comparables used in the Berke Appraisal were ascribed adjusted sales prices over $350,000. Mr. Berke arrived at his $330,000 valuation by averaging only the first two comparables listed in his appraisal. The Giuffre Appraisal uses four comparables with adjusted sales prices ranging between $320,000 and $389,500. ECF No. 33. The different values reached by the appraisers seems to result from two divergent factors: square footage and price adjustments.

Square Footage

The Debtors' appraisal states that the gross living area[3] at the Property is 1,382 square feet. Mr. Berke used this square footage despite his own notation that "Public Records indicate the subject has 1,436 square feet." Mr. Berke goes on to explain that his own measurement of the Property resulted in 1,382 square feet and he "utilized the actual measurements instead of using public record data." ECF No. 28. The Junior Lienor's appraiser found the gross living area to be 1,436 square feet based on his physical measurement of the Property, and the Suffolk County Clerk's Office public record. ECF No. 33. The difference in the appraisers' square footage numbers is based on a one-foot difference in the width of the house's footprint. *Compare* ECF No. 28 *with* ECF No. 33. Because the numbers are so close in this case, this one-foot difference which results in a total difference of only 54 square feet, is significant.

If we set aside for the moment the differences in the appraisers' price adjustments for sales comparables and simply divide the Debtors' proposed fair market value of $330,000 by the 1,382 square feet used by Mr. Berke, that would result in a price per square foot of gross living area of $238.78. The Giuffre Appraisal values the Property at $350,000 based on 1,436 square feet. Using this same analysis as above, the Giuffre Appraisal would result in $243.73 per square foot.

The Court finds it appropriate to adopt the 1,436 square foot number used by Mr. Giuffre. Although both appraisers testified that they personally measured the Property, Mr. Giuffre's square foot calculation is also supported by the Suffolk County public records. The Court has

---

[3] Gross Living Area is defined as the total area of finished, above-grade residential space excluding unheated areas such as porches and balconies. It is the standard measure for determining the amount of space in residential properties.

been presented with no basis to deviate from the square footage numbers found in the public records.

If the Court accepts all other assumptions and adjustments made in the Berke Appraisal the price per square foot of gross living area, as previously stated, would be $238.78. If that number is then multiplied by the correct square footage, the resulting value would be $342,888.08 ($238.78 times 1,436). This value is above the $339,862.54 balance on the first mortgage. On this basis alone, the Court is prepared to deny the Debtors' Motion.

The Court notes that Mr. Berke also deviated from the site square footage listed in public records with respect to one of the comparables in his appraisal. Mr. Giuffre testified that the public records reflect that the site square footage of the Lincoln Road Property is 14,375. This is the site square footage used by Mr. Giuffre in his comparable analysis. However, without explanation, Mr. Berke used 13,125 as the site square footage for the Lincoln Road Property. The Court in this case is presented with two very close valuations by two highly qualified appraisers. However, the Court must choose one of these appraisals over the other. Mr. Berke's square footage deviations call into question the accuracy of his report and therefore the credibility of his conclusions. The Court was presented with no such inaccuracies in the Giuffre Appraisal and the Court found the testimony of Mr. Giuffre to be credible. It is with this determination in mind that the Court will make note of some other discrepancies between the appraisals.

Price Adjustments

The top three comparable properties used by each of the appraisers were identical. In no particular order, they are: the Tulip Avenue Property; the Oakdale Bohemia Road Property; and

the Lincoln Road Property. The adjusted sales prices attributed to the Tulip Avenue Property by each of the appraisals were nearly identical and so the Court finds this comparable to be neutral in this analysis.[4]

With respect to the Oakdale Bohemia Road Property, there are some discrepancies between the price adjustments applied by the appraisers which contribute to the $29,000 difference in adjusted sales prices for this property used in the competing appraisals ($291,000 in the Berke Appraisal, and $320,000 in the Giuffre Appraisal). These discrepancies standing alone, do not resolve the valuation dispute, but they do guide the Court in its decision to adopt one appraisal over the other.

First, is the price adjustment for the basement. The Debtor's Property has a full, unfinished basement. The Oakdale Bohemia Road Property has a part, unfinished basement. In the Berke Appraisal, there was no price adjustment given to the Oakdale Bohemia Road Property on account of it having a part, as opposed to a full, unfinished basement. ECF No. 28. The addendum to the Berke Appraisal notes that there is "no adjustment for a full basement versus a partial as the market has an equal preference for both." On the other hand, Mr. Giuffre made a positive price adjustment of $5,000 for the part, unfinished basement. ECF No. 33.

The Court finds it appropriate to have applied this positive price adjustment for the basement. Although it appears to be Mr. Berke's regular practice not to distinguish between part unfinished and full unfinished basements, the Court will note that Mr. Berke did make adjustments for comparables that either had no basement, or had a full basement that was partly

---

[4] The adjusted sales price attributed to the Tulip Avenue Property by Mr. Berke was $351,490, compared to $350,990 by Mr. Giuffre.

finished. It would seem consistent and logical to make some adjustment for the space difference, albeit not in gross living area, between a part and a full basement.

Next, the different square footage numbers for gross living area used for the Debtors' Property by each of the appraisers also affected the adjusted sales price of the Oakdale Bohemia Road Property. The Oakdale Bohemia Road Property has a gross living area of 1,525 square feet. According to both appraisers, it is common practice not to make any price adjustment when the gross living area of a subject property and comparable property are within 100 square feet of each other. Therefore, Mr. Berke, using 1,382 square foot gross living area for the Debtor's Property, made a negative $7,000 price adjustment to the Oakdale Bohemia Road Property because there was more than a 100 square foot difference when compared to the Debtor's Property. ECF No. 28. Mr. Giuffre, on the other hand, made no price adjustment when comparing the gross living area of the Oakdale Bohemia Road Property to the Debtor's Property because the difference was less than 100 square feet. ECF No. 33. Because the Court finds that 1,436 square feet was the correct measurement to use in the appraisals, it also finds that Mr. Berke's $7,000 downward adjustment was inappropriate.

Finally, there was a notable difference between the appraisals attributable to the assessment of the condition of the Property as "fair" (Berke Appraisal) versus "average" (Giuffre Appraisal). Mr. Berke rated the Property as fair based on missing molding and unfinished painting on some interior walls as well as external factors which included a garage and shed in poor condition. Mr. Giuffre rated the Property as average based on his assessment that the inside of the home was not in need of extensive repair. He noted that the bathroom and kitchens were updated and were not original to the home, and he included a "cost to cure" adjustment to finish the unfinished painting and molding. Based on this Court's previous analyses of the comparative

accuracy, credibility and methodology of the appraisers, the Court is inclined to side with Mr. Giuffre's assessment of the Property as average.

## CONCLUSION

For all of the reasons cited above, this Court finds the Giuffre Appraisal to be more credible and a more accurate valuation for the Property as of the Petition Date. The Court adopts, for purposes of this Motion only, the Giuffre Appraisal's valuation of the Property and finds that the fair market value of the Property was more than the $339,862.54 balance of the first mortgage on the Petition Date. Therefore, the Motion is denied. The Court shall enter an Order consistent with this Memorandum Decision forthwith.



**Dated: Central Islip, New York**
**September 3, 2021**

_Robert E. Grossman_
**Robert E. Grossman**
**United States Bankruptcy Judge**